## In re BUCKLEY'S WILL.

*(Surrogate's Court, New York County. May 9, 1888.)*

1. WILLS—PROBATE—PROOF OF EXECUTION.

Upon application for probate of a will subscribed by F. and N. as witnesses, it appeared to have been read by F., who wrote it, in testator's presence, who also read it himself; no others then being present. F.'s first testimony was that testator signed in the presence of both witnesses, but, after hearing the testimony of N., agreed with him that testator signed before N.'s arrival, and afterwards declared the paper to be his will, and the signature to be his, before both. F. also testified that testator requested both to sign, while N. did not recollect that F. was asked, though both signed in testator's presence. B., a legatee, who was present, corroborated the witnesses to some extent, but testified that he also witnessed the will, which was evidently a mistake. *Held*, the execution of the will was sufficiently proved.

2. SAME—PROOF OF CAPACITY TO MAKE.

In a case where the mental capacity of testator was at issue, it appeared that, shortly prior to the execution of the will, he visited a physician, who testified that he regarded him as a mental and physical wreck, incoherent in speech, unfit for any business, and incompetent to give directions for a complicated bequest. Other witnesses testified similarly; while, on the other hand, a much greater number of witnesses, among whom were those having business connection with him, family servants, the priest who confessed him, and others having opportunities for observation, including a witness to the will, testified to his soundness of mind at about the time of the execution thereof. The will itself, except one clause of minor importance, was reasonable, and there was reason to believe that it was the fault of the draughtsman, and that testator, in reading the will hurriedly, overlooked its real purport. *Held*, that the preponderance of proof was in favor of testamentary capacity.[1]

3. SAME—UNDUE INFLUENCE—WHAT AMOUNTS TO.

In such case, it appearing that testator had lately married a woman with whom he had lived in adultery for years, and who was his principal legatee, the other legatee being an old employe; that the wife had stated that she intended to induce testator, who was then suffering from a chronic disease of which he soon after died, to destroy an earlier will, and make one in her favor; that she had solicited him to marry her; and that no children, brothers or sisters, or other near relatives, were disinherited thereby,—the will is not invalid, by reason of undue influence.

Petition for revocation of probate.

This was a petition by Catherine Green, next of kin of Joseph Buckley, deceased, for a revocation of probate of a paper purporting to be his last will and testament. The facts appear in the opinion of the surrogate.

*Alexander Finelite*, for proponent. *Edward J. McLean*, for contestant.

RANSOM, Surr. Allegations were filed in behalf of Catherine Green, a second cousin, and the only next of kin, of the decedent, for the revocation of the will. The decedent was the owner of many cheap lodging-houses, and had acquired an estate, real and personal, worth in the neighborhood of $15,000 to $20,000 at his death. The will was prepared by Mr. Finelite, who is the attorney in this proceeding for Margaret Buckley, the executrix and principal legatee. A few days before its execution, in August, 1885, Finelite called at the residence of the decedent, as testified by himself, at decedent's request, and took a memorandum of his testamentary wishes, and drew the will. The memorandum appears as an exhibit in evidence. On the 13th day of August the decedent went, in company with Thomas Burnett, his clerk and superin-

---

[1] As to the mental capacity of a testator, see In re Silverthorn's Will, (Wis.) 32 N. W. Rep. 287, and note.

tendent, and who is also a legatee under the will, to Finelite's office. The will was read to the decedent by Finelite, and was read by the decedent himself, as testified by Finelite; they alone being present. Finelite testified that then the decedent signed the will in his presence, and in the presence of the subscribing witnesses, and requested them to sign it. But the testimony of the other subscribing witness, Newcorn, and that of Burnett, caused Finelite to subsequently modify his statement. Newcorn testified, and in this he is confirmed by the evidence of Burnett, that he was not present when decedent signed the paper. Burnett states that, after the signing by the decedent, he was sent by him for Mr. Newcorn, and, on the arrival of Newcorn, the decedent acknowledged the signature to be his, and Finelite then "expressed something about the paper being his last will and testament, and if he acknowledged it to be his handwriting," and decedent said he did. Newcorn testified that Finelite read the attestation clause to the will, and decedent declared the signature to be his; that Finelite asked the decedent if the paper was his last will and testament, and decedent declared that it was, and he requested witness to sign his name, and he knows that decedent's name was on the paper at the time he (Newcorn) signed it. He does not recollect of the decedent asking Finelite to sign the paper. Burnett also testified that he also signed his name, but in this he was mistaken. Finelite, on being recalled for further examination, corrected his statement in respect to the signature of the decedent having been made in the presence of both the subscribing witnesses, and confirmed the statement of Burnett that, after the arrival of Newcorn, decedent acknowledged his signature, and asked him and Newcorn to sign it as witnesses, and, in response to his question, declared the paper to be his last will and testament. He also stated, as Burnett had done, that Burnett steadied the decedent's hand while he signed. He stated, also, that decedent had no impediment in his speech. The discrepancy between the first statement of Finelite, and his subsequent testimony confirming the recollections of Newcorn and Burnett, do not, in my opinion, militate against his intention to truthfully state the facts in respect to the execution. Newcorn seems to have been fair minded and truthful. He is a merchant on Chatham street, and had known the decedent for several years, and had a casual acquaintance with him. The mistake in Burnett's statement in respect to his having witnessed the will, which was patent, is evidence that he had no intention to misstate. Finelite seems to have a decided tendency to impulsive statement, and without due consideration of the importance of a careful recital of facts. I see no sound reason to doubt, however, that the will was executed in accordance with the statute, though by no means with the system and care which lawyers ordinarily follow when superintending the execution of so important an instrument.

Of the decedent's condition at the time of the execution of the paper, Finelite testifies that he was of sound mind, under no restraint, and had no impediment of speech, though his hand shook, and Burnett had to steady it when he made his signature. Newcorn saw no manifestations of lameness or paralysis, though the decedent's head was a little shaky. He heard the decedent cough. Burnett states that, when decedent wrote his name, his hand shook, and he held his hand to steady it, but the decedent was in as sound health as witness, for a man of his age. This was evidently an inconsiderate statement. The witness probably meant that the decedent was feeble from age, and, as to his mind, was not suffering from disease. The allegations of the want of testamentary capacity, or of undue influence, are attempted to be supported by evidence. The decedent, in early life, was a paper hanger in Boston. He subsequently kept a liquor saloon in that city, and afterwards came to New York, when he organized his enterprise of cheap lodging-houses, of which he had several running at one time, and conducted them through employes. For nine years previous to his death the evidence shows that the decedent and

the chief legatee had lived together in this city as man and wife, and she was held out by him to others as his wife. He introduced her as such, and she was known by their acquaintances as Mrs. Buckley. She had been an active co-worker with him in the management of the business, purchasing supplies, doing the necessary work in providing for and caring for the house, and receiving with him the receipts therefrom, and counting the money, paying bills, doing housework, etc. Her previous history illustrates one of the many phases of life in a large city. She was an Irish girl, and, according to her own statement, was seduced by a countryman, and subsequently, 20 years ago, began to cohabit with a negro named Hance, by whom she bore two children, one a daughter, who is now living and married. It was proven, and conceded on her behalf, that, during her cohabitation with Hance, she was known as "Margaret Hance" and "Mrs. Hance," and that she was reputed to be his wife, though she claims that no marriage ceremony had ever taken place between them. A colored man named Gage was produced as a witness, who testified that a colored minister, named Washington, (subsequently proven to be John Washington Parker,) had married Hance and Margaret in his presence. But Parker, who was himself examined under a commission, positively denied that he had ever married them, though he knew Hance well. Parker's book, containing entries of marriages, is produced in evidence, and it shows no record of such marriage. The entries in the book are not chronological, but the fact of the absence of Hance's name as a party to a matrimonial contract, with the witness' positive statement that he had never married Hance, whom he knew well, inclines me to believe that Margaret never was Hance's wife by a ceremonial marriage, and that she was free to marry the decedent. Hance and she were, about 11 years ago, living in Sullivan street, in a tenement in the rear of decedent's house, and she entered his employment and subsequently left Hance, and began to cohabit with the decedent. The relation was doubtless meretricious in its conception; but on the 10th of August, 1885, three days before the execution of the will, they were married by the Rev. William Everett, the priest of the Church of the Nativity, in his pastoral residence, on Second avenue. Father Everett had seen the decedent once or twice before, and on one occasion had received his confession. It appears, by the testimony of several witnesses, that the decedent knew of the previous relations between Margaret and Hance, and that the daughter of Mrs. Buckley, by Hance, had at times been in decedent's house; and that, when she was a child, he (decedent) had paid for her board and education for several years. Three days after he married, the will was executed, and two days after that the decedent and his wife left for Marlborough, Mass., he being at the time quite ill. He remained at the residence of John Tracy, under the care of Freeney, one of his employes in New York, who had been sent for, until he died, on the 27th of August. During the interim, Mrs. Buckley made three trips to New York, at the decedent's request, to look after the business.

In respect to decedent's mental capacity near the period of the execution of the instrument, there is a contrariety of evidence. It appears that, some 10 years since, an operation was performed on the decedent by Dr. Briddon, by reason of a fistulous opening in the neighborhood of the left ear, which led to a dead bone. He saw nothing of decedent subsequently until some years after, when decedent called on him, with his wife, in respect to treatment for her, for some ailment; and then in the latter part of July or August, 1885, shortly prior to the making of the will, decedent came to his office, in company with Burnett, "in a bad condition," suffering from peripheral neuralgia, and symptoms which he regarded as indicative of brain trouble, as associated with the condition for which witness had operated on him 10 years before. He considered decedent's mental condition very bad; stated that he was scarcely able to go about, was incoherent and paralyzed, and suffered from insomnia from his

severe pains; and witness regarded him as mentally and physically a complete wreck, and he did not think that he was capable of attending to business properly; that he was not entirely irrational, but regarded him as not a man of sound mind in the three or four days' visits decedent made to him. He was capable of giving orders, but whether they were rational or not witness thought was extremely doubtful, and he did not think that the decedent would be competent to give directions for a complicated bequest. I have considered this evidence, as it was received without objection, but I do not regard it as admissible. And so in respect to that of Dr. Saals, of Marlborough, Mass., who attended him in his last illness, although, in my opinion, it is incompetent. John J. Tracy, of Marlborough, at whose house decedent stopped, saw him in this city in July, 1885, about three weeks before decedent came to his house in his last illness, and decedent complained of his head. But the witness states that the decedent went to his business at night, though he was continually complaining about his head; and, when he sat down, he would talk as if somebody was around and doing him an injury in some way; and in the street and in his business he would be talking in the same way. Mrs. Tracy, the wife of the last-named witness, stated that the decedent complained of his head all the time at Marlborough, and said that if he had a pistol he would shoot himself; that he would lie down and go to sleep, and would rave and jump up; that he talked very little; and that the decedent used to call his wife vulgar and opprobrious names, though this Mrs. Buckley denied when recalled in rebuttal. This comprises all there is of testimony tending to show mental incapacity. But, in the third and fourth clauses of the will, the instrument directs and empowers his executrix, under her charge and supervision, to erect upon his burial plat in the cemetery of Brookline, Mass., a monument, and to build a stone wall around it, and that no other body be buried there except his wife, Margaret, and the plat to be closed thereafter. Finelite, who was the draughtsman of the will, testifies that the instrument was read by him to decedent, and was read by the decedent himself just before its execution. But the evidence in the case shows that, two years before, the monument had been completed, with a stone wall around it, and that decedent's first wife was buried in the plat. A photograph of the monument, and wall surrounding, is attached to the commission under which certain testimony was taken, and it is quite pretentious in its appearance. This fact would naturally suggest a doubt as to the decedent's mental condition at the time of the execution of the instrument; and it is evident that, if the decedent gave any directions in respect to the matter at all, Finelite misunderstood them. The *memoranda* taken for the preparation of the will contain nothing in reference to the subject, and it may be that the direction was written from memory only, and included more than was intended; for, when the paper was read to the decedent by Finelite, it is apparent that the decedent did not understand that the direction was for the putting up of a monument, and not for the completion of the surroundings of one already erected. Upon the supposition that the will was executed in good faith, which I have no reason to doubt, in view of the testimony of Newcorn and Burnett, in order to arrive at a just conclusion as to the facts in reference to the provision for the monument, reference must be had to other testimony in respect to decedent's mental condition about the time of the execution of the will, and, to a certain extent, anterior thereto. Newcorn, one of the subscribing witnesses, was not asked as to the condition of decedent's mind. Burnett, who is a legatee to the amount of about $400, and who was present at the execution, testifies, as a physical fact, that the decedent's hand, when he signed the instrument, shook a little, and he had to hold it to enable him to write. Finelite testifies that the decedent appeared to understand very well, and answered him; and he thinks that, in giving the direction about another monument, the decedent stated that he had one there, but wanted a nicer one and a new wall. Father Everett, in the two or three

interviews he had with the decedent before the marriage, saw nothing in decedent's appearance to indicate that he was not of sound mind; and, when he received decedent's confession, his conversation impressed him as rational. Patrick Mead, who was employed in doing plumbing work in decedent's house previous to and at the time of his departure for Marlborough, the 15th of August, stated that the decedent spoke about the alterations he proposed to make in the building, and told the witness what he proposed to do, and pointed out a portion of them. He saw the decedent on the 15th, in the sitting-room, and and conversed with him in regard to the work they were to do to the building, and decedent told him that he wanted to remove some of the pipes in the upper portion of the building, as the roof was about being taken off, and he directed the witness to take care of the pipes, as he wanted to use them when they were ready to perform the other part of the work. He said his conversation was rational. McGrath, a mason and brick-layer, who was also at work on the building, gave testimony to the like effect. The decedent told him to take directions from his wife about the walls, as she knew more about the matter than he did. Kate Lane, a domestic employed in decedent's household, heard him talking to Mr. Mead, the plumber, about the time he left for Marlborough, and on the morning of his departure she gave him his breakfast, which he ate, and bade her good-bye. Mr. Stevens, the owner of one of the premises hired by decedent for a lodging-house, did not consider him eccentric or peculiar in his habits, but close in his dealings, and capable of making a close trade. He thinks he saw decedent as late as 1885. Sohmer, who was in decedent's employment for several years, saw him in 1885, and had brief conversations with him, and he thought he was in his full senses at the time. Goldberg, a dealer in bedding, who sold goods to the decedent and his wife, saw him about four weeks before his death at his house on Second street, when decedent spoke of mattresses that had been made for them, and about the additional story he was putting on his house. Hale, who for several years was in the decedent's employment, met him in the forepart of August, 1885, in the Bowery, near First street, and had a conversation with him, which was rational, and he had seen him within a year previous at least a dozen times. Johanson and Weibel, who had been lodgers in decedent's private residence on Second street, made a trip to Marlborough to visit him in his sickness a few days before his death, and found him very ill. He expressed pleasure at their coming so far to see him. In their previous intercourse they had always found him to be rational. Freeney, who was also an employe, and in charge of one of decedent's lodging-houses, was with him in Marlborough constantly day and night for nine days previous to his death, and during this period was conversing with decedent, as he expresses it, "all the time," which probably means more or less during each day, and that the decedent's conversations were rational, and that he heard him direct his wife to go to New York to attend to the business. An important fact to be taken into consideration is that for eight years at least the decedent had published Margaret to the world as his wife; that she had done the duties of a wife, had been a helpmate to him; and, though the relation was probably begun and continued meretriciously, if she were competent to marry, the relation was made unquestionably lawful by the ceremonial marriage on the 10th of August. If he regarded her as his wife, nothing would be more natural than that he should desire to provide for her after his death, particularly as his only next of kin was a second cousin, for whom it is not shown by the evidence he had ever expressed a purpose to provide by his will, and whom he had not seen for years. The evidence shows that, even about the time of the making of the will, the decedent carried on his business, gave directions about the alterations in his house, recognized friends and acquaintances, talked with them rationally, and acted as any man in possession of his faculties would, but who was suffering from severe illness. The scheme of the will was to provide for his

wife, and to make a certain provision for Burnett, who for years had been a trusted clerk and superintendent. The other matters were of minor importance, and it is reasonable to suppose that the clauses referring to the erection of a monument on his burial plat, when one already existed, was a blunder of the attorney in not properly appreciating the instructions of the decedent; and that in the haste of reading the paper decedent did not understand the real purport of the clauses. And while it is probably true that there were times when the decedent's mind wandered, and he was incoherent in speech, as testified by Dr. Bridden, his conclusion of decedent's want of mental capacity can hardly weigh against acts and conversations showing soundness of mind at or about that time.

The only matter left for consideration is the allegation of undue influence; and the principal evidence adduced to support it is the declarations of Mrs. Buckley, which were admitted without objection. Mrs. Tracy states that, after the arrival of the decedent and Mrs. Buckley at her house in Marlborough, she took the witness into her kitchen, and told her that the decedent had made a will leaving everything to her, and that she would not let him leave New York until he had made a will to suit her; that he had made a will two years before; and that she was going to New York to destroy it. Mr. Tracy testified substantially to the same declarations, but from the language he uses it is doubtful whether he does not speak from hearsay only. He says: "When she first came to our house, she went right into the kitchen, and told my wife that he had made a will," etc. At all events, there is a suspicious identity in the language used by both Tracy and his wife. This testimony should have been excluded, and no doubt would have been had it been objected to by Mrs. Buckley's counsel, she not being the sole legatee. But Mrs. Buckley denied that she had made any such statement. Still it is not unreasonable to suppose that she had expressed a wish to have a will made to provide for her. Once, when the witness Reardon was visiting this city from Boston, she asked him to request the decedent to provide for her, so that she would not be left in a destitute condition, and the witness did speak to the decedent about the matter, and the reply was an ejaculation, "Bah!" the meaning of which was not explained. It is a fair inference, also, that she solicited the decedent to become her husband by a ceremonial marriage. It is natural that she should have done so. Father Everett testifies that she called upon him, and made the arrangement. But influence exerted in either case cannot be regarded as "undue," even if the fact be conceded that the decedent was suffering from a chronic illness, accompanied with physical weakness, and which, in a few weeks, ended in his death, especially in view of the fact that the relation of husband and wife existed, so far as repute and publications were concerned, between them for nearly 10 years. Had the decedent disinherited children, or even brothers and sisters, with whom he had been upon terms of intimacy and affection, there might be greater doubt of his mental condition. But there is no proof of the existence of any previous will except the declarations of Mrs. Buckley, and the fact stated by the witness Reardon, who testified that two years previous to his death decedent told him that he had made his will, and had appointed Reardon one of the executors. It may be that, if such an instrument was executed, the contestant was provided for in it; and, if so, it may be that her failure to come to New York at decedent's request to make a home for him, as testified to by her husband, caused him to execute the will in question, and make no provision in it for her. Some of the facts in the case proven are of a character to suggest doubts; but on the whole case, in view of the relations of all the parties concerned, the preponderance of evidence is that the instrument was the free and voluntary act of a man having the mental capacity to make a will, and that the requirements of the statute were complied with in its execution. A decree may be submitted denying the petition for the revocation of probate.